**09-9069**

Exhibit A.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT

FILED
IN CLERK'S OFFICE
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT
OF GEORGIA

OCT 18 2009 PM 04:17

M. REGINA THOMAS,
CLERK

BY:_____
DEPUTY CLERK

**FILED UNDER SEAL**

-----------------------------------------------X

UNITED STATES OF AMERICA
EMC Search, LLC

         Claimant,

  - against -

GOLDMAN SACHS, INC. et. al.,
FIDELITY NATIONAL FINANCIALGROUP, et. al,
SUNTRUST BANK HOLDINGS, INC. et. al.,
GENWORTH FINANCIAL, et. al.,

         **Respondents,**

-----------------------------------------------X

COMPLAINT FOR INJUNCTIVE AND
EQUITABILE RELIEF UNDER THE
COMMODITIES EXCHANGE
COMMISSION ACT , AS AMENDED
7 U.S.C.§§ 1-27, VIOLATIONS OF THE
OMNIBUS APPROPRIATIONS ACT OF
2009, VIOLATIONS OF THE CONUSMER
FINANCIAL PROTECTION AGENCY,
CIVIL REVERSE FALSE CLAIMS ACT,
VIOLATION OF PROVISION 11 **USC § 362**

Claimant EMC Search, LLC (and those who find themselves similarly situated) collectively referred to as "EMC", respectfully submits this Complaint to the Enforcement Division of the Commodities Future Trade Commission (CFTC), and states as follows with respect to the conduct of Respondent's "financial institutions" Directors, Agents, Board, former and current employees, owner's, affiliates, and subsidiaries known and unknown & confidential matters.

## I. STATEMENT

1. This complaint arises out of Respondents' unlawful Investment Banking (Equity Indexed Insurance Annuity Divisions) hereinafter collectively referred to as "CMBS/CDO", and a result of a consumer credit transaction within an arm's length. With the intent to harm EMC resulted in the world's largest financial failure the banking and finance industry costing taxpayers in excess of over $350B without disclosure to the citizens of the United States of America. The

**IN THE MATTER OF CHICAGO TITLE INSURANCE COMPANY, FIDELITY NATIONAL TITLE INSURANCE COMPANY, SECURITY UNION TITLE INSURANCE COMPANY, FIDELITY NATIONAL TITLE INSURANNCE COMPANY OF NEW YORK, and TICOR TITLE INSURANCE COMPANY**

## MULTI-STATE REGULATORY SETTLEMENT AGREEMENT CONCERNING CAPTIVE TITLE REINSURANCE ARRANGEMENTS

THIS MULTI-STATE REGULATORY SETTLEMENT AGREEMENT (the "Multi-State Agreement") is entered into on this 7th day of September, 2005, by and between Chicago Title Insurance Company, Fidelity National Title Insurance Company, Security Union Title Insurance Company, Fidelity National Title Insurance Company of New York, and Ticor National Title Insurance Company (collectively "Fidelity"), and the Insurance Commissioners of those states (the "Signatory States") who adopt, approve and agree to this Multi-State Agreement in accordance with the provisions of this Multi-State Agreement. The Signatory States find and order as follows:

1. At all relevant times, the Signatory States had jurisdiction over Fidelity and the subject matter of this Multi-State Agreement.

2. On or about October 22nd, 2004, the Colorado Commissioner commenced an investigation of Fidelity to determine whether certain captive title reinsurance arrangements violated state and federal kickback laws. In addition, Fidelity received inquiries from the following state Departments of Insurance ("DOI") and/or Attorneys General ("AG"): Arizona DOI; California DOI, Colorado AG; Connecticut DOI, Idaho DOI; Michigan DOI; Minnesota DOI; Montana DOI, Nevada DOI; New York AG; North Carolina DOI; Ohio DOI; Virginia DOI; and Washington DOI. Based upon Fidelity's responses to the Colorado interrogatories and documents it provided, the Signatory States have agreed to accept the findings set forth in this Multi-State Agreement.

3. By their signatures and delivery of this Multi-State Agreement, as described below, and by virtue of the execution of this Multi-State Agreement by the Signatory States, the Signatory States each acknowledge and agree that they have read and understand the terms and conditions of this Multi-State Agreement and agree that the execution of this document fairly, reasonably and adequately addresses the concerns of affected citizens in their respective states. In addition, the Signatory States, by way of signature below, give that state's express assurance that under applicable state laws, regulations and judicial rulings, each has the authority to enter into this Multi-State Agreement.

**EXIBIT**

4. Fidelity entered into two relevant types of reinsurance arrangements. These arrangements are known as: (1) Single-parent captive title reinsurance; and (2) sponsored captive title reinsurance, also known as protected cell captive reinsurance.

5. In a single parent captive reinsurance arrangement, a settlement producer (a homebuilder or lender) and a title insurer enter into a reinsurance treaty. The title insurer agrees to cede title insurance policy liability to a reinsurer owned in whole or in part by a homebuilder or lender, or their respective affiliates.

6. In a sponsored captive reinsurance arrangement, a settlement producer (homebuilder or realtor, or group of either or both) and a title insurer enter into a reinsurance treaty. The title insurer agrees to cede title insurance policy liability to a reinsurer that is owned by the title insurer itself. The title insurer maintains each settlement producer's business in individual accounts within the reinsurance entity.

7. On or about April, 1999, Fidelity began entering into single parent reinsurance arrangements with Vermont-licensed captive title reinsurers wholly-owned by certain homebuilders or their affiliates. Pursuant to the arrangements, Fidelity agreed to reinsure all title business it received from the builder in a defined geographical area with the builder's reinsurance entity. Generally, under the terms of the reinsurance arrangements, Fidelity deducted a "processing fee" (typically $350) from the policy premium for the production of the title policy. Fidelity then paid 50% of the remaining premium to the reinsurer as a reinsurance or cession premium, and the reinsurer assumed 50% of the policy liability on a quota-share basis.

8. On or about September, 2001, Fidelity began entering into single parent reinsurance arrangements with Vermont-licensed captive title reinsurers (and one South Carolina captive title reinsurer) wholly-owned by certain institutional lenders or their affiliates. Pursuant to the arrangements, FNF agreed to reinsure all title business it received from the lender for refinancing in a defined geographical area with the lender's reinsurance entity. Generally, under the terms of the reinsurance arrangements, Fidelity deducted a "processing fee" (typically $250) from the policy premium for the production of the title policy. Fidelity then paid 50% of the remaining premium to the reinsurer as a reinsurance or cession premium, and the reinsurer assumed 50% of the policy liability on a quota-share basis.

9. On or about September, 2003, Fidelity began entering into sponsored captive reinsurance arrangements with certain builders. Pursuant to the

arrangements, Fidelity agreed to reinsure all title business it received from certain builder transactions in a defined geographical area with Fidelity Title Reinsurance Company, a Vermont-licensed reinsurer affiliated with Fidelity (and wholly owned by an affiliate of Fidelity). After deduction of a processing fee, Fidelity paid 50% of the remaining premium to the reinsurer as a reinsurance or cession premium, and the reinsurer assumed 50% of the policy liability on a quota-share basis.

10. On or about September, 2003, Fidelity began entering into sponsored captive reinsurance arrangements with certain real estate brokers. Pursuant to the arrangements, Fidelity agreed to reinsure all title business it received from the real estate brokers with Fidelity Title Reinsurance Company, a Vermont-licensed reinsurer affiliated with Fidelity (and wholly owned by an affiliate of Fidelity). After deduction of a processing fee, Fidelity paid approximately 10% to 20% of the premium to the reinsurer as a reinsurance or cession premium, and the reinsurer assumed the respective policy liability on a quota-share basis.

11. In the sponsored captive reinsurance arrangements, the builders and real estate brokers, or affiliates formed by them (the "Participants") executed Participation Agreements with Fidelity Title Reinsurance Company. Under the Participation Agreements, the Participants indemnified Fidelity Title Reinsurance Company for any claims losses and, in return, received distributions as provided in the Participation Agreement.

12. On or about February, 2005, Fidelity informed the Colorado Division of Insurance that it had terminated on a nationwide basis, all of its reinsurance arrangements and any related Participation Agreements in accordance with their respective terms or notice provisions and/or obtained mutual immediate termination from certain reinsurers. Also in February, 2005, Fidelity asserted to the Colorado Commissioner that all cession payments to any captive reinsurer, and all distributions to any Participant, were permanently suspended and terminated in all states.

13. Fidelity asserts its belief that the captive title reinsurance agreements (and related Participation Agreements) to which it was a party were structured in conformance with the provisions of federal law (RESPA). In particular, Fidelity asserts its belief that the arrangements were in conformance with both an August 6, 1997 letter from HUD permitting captive reinsurance agreements in the field of mortgage reinsurance under certain defined circumstances, and a later letter dated August 12, 2004 that specifically provided that the August 6th letter also applied to captive title reinsurance arrangements.

14. The Signatory States assert that, after the Colorado Division of Insurance's review, and/or their own review of Fidelity's answers to

3

interrogatories, copies of the reinsurance treaties, annual statement filings, and other documentation submitted by Fidelity, the captive title reinsurance arrangements described in this Multi-State Agreement violate state and federal laws prohibiting kickbacks for the referral of title business, including, but not limited to 12 U.S.C. § 2607, commonly referred to as Section 8 of The Real Estate and Settlement Procedures Act of 1974 ("RESPA").

15. The Signatory States and Fidelity, in order to avoid the expense, uncertainty, and distractions of litigation, and without Fidelity admitting or denying the allegations set forth in this Multi-State Agreement, desire to resolve this matter and therefore stipulate and agree as set forth in this Multi-State Agreement.

16. Fidelity will promptly and voluntarily issue refunds to all consumers in all Signatory States where any consumer paid any portion of a title insurance premium that was allocated to a reinsurance entity pursuant to any of the above-referenced reinsurance arrangements or Participation Agreements. As of the date of this Multi-State Agreement, the parties estimate that approximately 18 states qualify as Signatory States, and approximately $1.2 million will be refunded under the terms of this Multi-State Agreement.

17. Fidelity agrees to exercise its best efforts to complete the refund process in each Signatory State, no later than one hundred twenty (120) days from the date that particular Signatory State signs the Multi-State Agreement. The failure, refusal, or delay of a particular Signatory State to sign the Multi-State Agreement shall not affect the rights and obligations of Fidelity as to the other signing Signatory States.

18. Fidelity will continue to cease and desist operating under the described captive reinsurance arrangements and will diligently make the refunds outlined in this Multi-State Agreement.

19. Fidelity will not enter into any new captive reinsurance arrangements substantially similar to those described and affected by this Multi-State Agreement provided, however, that Fidelity will be relieved from the cease and desist terms of this agreement by any order entered by a court of competent jurisdiction determining that the above described captive reinsurance, arrangements or participation agreements substantially similar to the same, are legal under federal law and the respective state law of the Signatory State.

20. The intent and purpose of this Multi-State Agreement is to provide for the complete settlement of the alleged violations described in this Multi-State Agreement, occurring on or before the effective date of this Multi-State

4

Agreement. Any other allegations, facts, and issues not described in this Multi-State Agreement have not been considered and are not made a part of this Multi-State Agreement. By entering into this Multi-State Agreement, Fidelity shall not be deemed to have made any admission of liability or wrongdoing. By execution of this Multi-State Agreement, it is the intent of the Signatory States and Fidelity to resolve all issues pertaining to the matters alleged above without the expense and uncertainty of litigation.

21. The parties agree that this Multi-State Agreement shall be fully executed as to each state upon the signature of both Fidelity and that particular Signatory State. The failure, refusal, or delay of any Signatory State to sign the Multi-State Agreement shall have no effect on the rights and obligations imposed by the Multi-State Agreement as to Fidelity and the other Signatory States who have signed the Multi-State Agreement.

22. This Multi-State Agreement shall not be used as evidence of the truth of the facts alleged by the Signatory States, or as evidence of an admission or wrongdoing.

23. Fidelity understands and acknowledges that this Multi-State Agreement is a public record. Fidelity further understands that the Colorado Division of Insurance will send notice of this Multi-State Agreement to the NAIC, and that the Signatory States may, in their discretion, notify any other person of the content and terms of this Multi-State Agreement.

24. This Multi-State Agreement constitutes the complete agreement between Fidelity and the Signatory States. All previous agreements, understandings, representations or warranties have been fully and completely merged and integrated into this Multi-State Agreement.

25. Fidelity is aware of and understands the right to receive a formal notice of hearing and to have a formal administrative hearing as to this matter pursuant to the laws of the Signatory States. Fidelity hereby waives those rights and requests that this Multi-State Agreement be accepted by the Signatory States with the same force and effect as an order entered into as a result of a formal administrative proceeding. Fidelity further waives the right to either administrative or judicial appeal this Multi-State Agreement.

26. This Multi-State Agreement shall be binding on Fidelity and on the Signatory States executing this Multi-State Agreement. Any State that wishes to become a party to this Multi-State Agreement shall execute a State Amendment page within sixty (60) days from the effective date of this Multi-State Agreement, which is September 7, 2005.

27. The Signatory States reserve the right to impose fines, penalties, and take any and all other actions necessary to carry out the terms of this Multi-State Agreement if Fidelity fails to comply in good faith with all provisions of this Multi-State Agreement. In such event, Fidelity shall be responsible for reimbursing the affected Signatory State(s) for expenses incurred in bringing such action. Each Signatory State reserves the right to request from Fidelity proof of compliance in such State to ensure that the provisions of this Multi-State Agreement are enforced.

28. Fidelity enters into this Multi-State Agreement voluntarily, absent any duress or coercion on behalf of the Signatory States, after the opportunity to consult with legal counsel, and with full understanding of the legal consequences of this Multi-State Agreement.

29. This Multi-State Agreement may be executed in counterparts, and a facsimile signature will have the same force and effect as an original signature penned in ink. When Fidelity and each of the Signatory States has signed and delivered at least one such counterpart, each counterpart shall be deemed an original, and when taken together with other signed counterparts, shall constitute one fully executed Multi-State Agreement which shall be binding upon and effective as to that particular Signatory State according to its terms.

APPROVED AND AGREED TO BY AND ON BEHALF OF CHICAGO TITLE INSURANCE COMPANY, FIDELITY NATIONAL TITLE INSURANCE COMPANY, SECURITY UNION TITLE INSURANCE COMPANY, FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, and TICOR TITLE INSURANCE COMPANY

By: _____ EVP

Peter T. Sadowski
Executive Vice President and General Counsel

## STATE AMENDMENT

This Multi-State Agreement is accepted by the Commissioner for the State of Colorado with full force and effect in accordance with the terms of the Multi-State Agreement.

By: _____    9/7/05
Commissioner                              Date

7